You know the lighting system, when the yellow light goes on, that means that your time is drawing to a close, so begin to wrap up. If we take you beyond the red light, then don't worry, just keep talking to us, and you're on our time and not yours. And with that, we'll begin with our first case this morning, case number 15-15235, United States v. Brian Newton and Victoria Snow. Who is going first? Mr. Abrams? That's correct. Okay. Can you tell me how to pronounce your last name? Chimelier? Chimelier. Chimelier. Okay, I'll try to get it right. Okay, Mr. Abrams. May it please the Court, good morning. David Abrams on behalf of Appellant Victoria Snow. Ms. Snow is denied a fair trial due to deficient jury instructions for mail fraud and wire fraud. In this circuit, and a majority of the circuits, mail fraud and wire fraud require mens re of both knowledge and willful actions. Isn't the problem, though, she got the instruction she asked for? Your Honor, yes, she did ask for that instruction. And in this particular case, what's happened is that there was a missing element that went to the actual charge. The cases that the government cites in regards to constructive amendment or invited error deal with changes in facts that support the charge. But usually when a party, a criminal defendant, says this is a charge I'd like, and the judge says, okay, you got it, didn't you invite an error or forfeit any objection on this? Your Honor, that is correct. You do invite the error, but the error went to the actual element of the charge. And the statute doesn't include the element willfully. That is correct, Your Honor. The statute doesn't. But the case law in this circuit talks specifically that willfulness is a requirement for a finding of guilt. And that was the U.S. v. Ward case where they talked about it, and there have been numerous other cases. Well, what do you think about the possibility that the intent to defraud language might subsume the concept of willfulness? The intent to defraud does not go to the aspect of voluntary and purposely with the intent to do something that the law forbids. Intent to defraud can be from a jury's point of view. They can look at that in a different manner, and that's why the willfulness element is required. It has to show that there is some form of illegality or some purposeful intent to disobey or disregard the law. And willfully and knowingly doesn't cover that? Knowingly only goes to the knowledge of the fact. It doesn't go to the purposeful action to disregard the law. So the issue here is that we have this omitted element. And while the cases that the government cites to talk about invited error and talk about constructive amendment deal with the changes in facts that support the charge or supplemental instructions or omitted definitions, it doesn't go to the omitted element. The Nieder v. U.S. case, the Supreme Court case, provides a better understanding for this court to apply. In Nieder v. U.S., also a mail fraud and wire fraud case, we had the issue of materiality, which was not in the statute, yet the Supreme Court said materiality is a requirement. Yes, that was a case of first impression. That is correct, Your Honor. The materiality, however, was looked at and the Supreme Court looked at it and came up with this two-part test based on Chapman v. U.S., looking and determining whether or not this was something that was intrinsically harmful to substantive due process. Yes, but didn't the Supreme Court affirm the conviction? The Supreme Court reversed on this issue. In Nieder? In Nieder, I'm sorry. Wasn't Nieder the harmless error? That is correct, Your Honor. Follow-up on Gauden? If I remember correctly. Right, Gauden is the case that says materiality is an element. Right. Right, and then Nieder addresses whether or not the omission of that element can ever be harmless error and says, yes, it can depending on the circumstances. Right, and they look at whether or not there was sufficient evidence to get past the reasonable doubt. And here, in this particular case, we do have sufficient evidence to show that there is still reasonable doubt. The facts in this particular case show that Ms. Snow, the trial of 13 days, about 15 minutes of that trial was concerning Ms. Snow only. There was no evidence to support or present to that trial that showed that she voluntarily or purposefully acted with intent to do something that the law forbid. The district court judge stated during sentencing that Ms. Snow was not the instigator and worked under Mr. Newton. And to paraphrase, you may not believe this to be a problem in the beginning, but over a period of time, there had to have been some recognition that the conduct was unlawful. So I think the judge looked at it and said, wait a second, you know, she did not recognize that there was this willfulness act. And maybe in the beginning, we don't know when the willfulness act may have come into play, but it may not have come in the beginning and may not have come in the middle. And I think that's why we're looking at requesting a new trial on this particular matter. OK. Now, with regards to. Excuse me one second. Tax return. Yeah. OK. We looked at this court. I'm sorry. We're showing that Miss Snow did not have enough facts to show that she was. Willful in her actions. And likewise, we also have this one additional aspect, and that was the fact that during the trial there was a document placed into evidence that had Mr. Newton's wife's name on it, violating the court order, asking and requesting and demanding. Wasn't that the defense counsel's fault for not redacting it? Yes, but they did this at the 11th hour on the 10th day of trial. And I think that that's what caused this problem. When you try and fix something right on the fly at the last minute, you're bound to make mistakes. But now, please, please. With regards to that issue, do you remember from when that tax return was in terms of time? I don't recall. Because assuming it was error, then that may have some potential for harmlessness, right? Because if you have a tax return that's, let's say, in a hypothetical world, 10 years old, a lot of things can happen in 10 years, and a jury may not draw the inference that Mr. Newton was married at the time that he and Ms. Snow began a relationship. That is correct, but the court's order said that they wanted to remove all evidence. I know. No, no. That's why I'm saying assuming it's error. I'm with you that there's error. So my question is, but you don't have a recollection of from what year that tax return was It's in the index that we provided to them. We'll find it. All right. You've saved your time for rebuttal, Mr. Abrams. Thank you very much. May I proceed? Yes, of course. May it please the Court, Counsel, Andrew Shumler, on behalf of Brian Newton, the appellant. The first issue I'd like to address is the issue of loss. Mr. Newton had a lengthy trial. During the trial, the government made no effort to specifically prove a specific quantifiable loss as defined under the sentencing guidelines. So instead, at the sentencing hearing, the government attempted to rectify that issue and prove to the court what the actual loss was. The trial attorney for Mr. Newton filed a sentencing memorandum where she expressly advised the court that she objected to the loss calculation purported or proposed by probation. Then at the sentencing hearing, the government had two documents, purported summaries, which it presented to the court. When it was presented to the court and when the issue of loss was presented to the trial court, defense counsel had a long, lengthy discussion with the trial court, wherein she advised the district court that these charts, these summaries were inaccurate. And she reminded the court that the government bore the burden at the sentencing hearing to prove up the allegations on these documents. Well, here's my understanding. And I've read through the sentencing transcripts, and you'll understand with me that I wasn't there looking at charts, and it's awfully hard to follow when people are throwing numbers at, but I tried to follow it as well as I could. But my sense was that defense counsel wasn't complaining that the charts weren't authenticated or where did you get this number or that number. My sense was that everybody was pretty much on board with where various numbers came from, but the defense counsel instead was arguing that investment monies for the third company should not have been considered, that there were some investors in a different company whose name escapes me now, but that that shouldn't have been counted in, and it should have just been the investors in the company that was at issue, plus whatever the fraudulent amounts of money were, and that all the arguments were about how do you segregate those numbers. But I got no sense that there was any authentication issues or any dispute about particular numbers. And, in fact, she didn't object to that. But here in the brief, you're sort of arguing, oh, we needed a witness to authenticate the summaries. Is my reading accurate? I believe it's accurate in that she did make those arguments, but I believe that it neglects to reference the parts where she said, and there were really two issues during the trial. With regards to AmeriFactors, the summary government witnesses, their own witnesses testified, you had this purported loss, but they were buybacks, wherein AmeriFactors didn't really sustain some of these losses because DataForce, which was one of the other entities, bought the items back. Monies were returned. Those are excluded from loss. So she mentioned that at the sentencing hearing repeatedly, repeatedly. These charts don't consider buybacks. The prosecutor in response simply gave his own verbal representation that the buybacks were not in there. She also referenced the fact that- Well, tell me, what do you think the loss amount is? I don't believe the government proved it because we have the issue with the trial test. Based on the evidence, what would you- She was agreeing that there was some loss. She wasn't saying, what would you say the loss amount is? So I would say that the government bore the burden of proving a loss. There were two issues that their witnesses at trial testified to. There were buybacks. No one anywhere ever quantified what the buybacks were. And number two, there was an issue of- But again, you're at a sentencing hearing. Defense attorneys are not usually that difficult about it. They'll say, Judge, this amount of loss we don't dispute, but this is all is. What would you say the amount of loss was that was proved? I don't believe any of it was proved because you have the issue of the prosecutor conceded this. The prosecutor said at the sentencing that AmeriFactors, we don't know how much of a given invoice they factored. We're going to look at the contract, and their contract was to factor 90 percent. So therefore, this isn't- But the guidelines, advisory as they are, ask district courts to make a reasonable estimate of loss. And in cases where there are hundreds or thousands of transactions, using a contract basis doesn't seem- From a starting point, it doesn't tell you everything. From a starting point, it doesn't seem all that crazy to me to say parties generally adhere to contracts. So we'll assume, absent evidence to the contrary, that they factored a certain percentage of the invoice. So I think the guidelines call for you can estimate in certain circumstances. But when someone's life and liberty is at stake, you can't guess. And that's the issue here, guessing versus an estimate. And the prosecutor called upon the court to guess. Nobody knows. Nobody, there's nothing in the record. What percentage was actually paid? What was the actual loss? And you can't go on the alternative theory. If you can't estimate it, the guidelines commentary says you can go on the gain to the defendant. We can't go on the gain because the government's testimony at trial, they never looked at- And there was no evidence at trial from- I haven't read the trial transcript. Sure. Like Judge Karnes, I looked at the sentencing transcript, but I haven't read the trial transcript cover to cover. Was there any testimony from any representatives of those other two companies about what happened to them? At least their perspective as what happened to them in the alleged scheme. And at least testimony as to some losses. Was there any of that at a trial? Right. So there was one witness from Amerifactors said that they believed the loss was over $2 million. They gave a number. They didn't quantify buybacks, all of that. But later on, the summary witness, their chief law enforcement agent assigned to the case, acknowledged that buybacks were an issue. But he said that wasn't my job. I was just tracking the flow of monies for purposes of proving the conspiracy. And just very briefly on the prestige chart, which was the other set of victims, only three witnesses testified at the sentencing hearing. They provided a chart that purportedly had 66 victims. So, again, this was just-none of it was proved up. It was just the prosecutor's verbal representations. And I humbly suggest that the defense counsel did object to the veracity and accuracy of the charts. Well, I thought you were going to spend your time on the sentencing in the one book and you haven't heard from you. That would actually have some real benefit to your client if we could extend just a little bit so you could frame that argument so the government could respond. Sure. Tony, can you please give him three more minutes and we'll give Ms. McNamara the same amount of extra time, please. So, in the one book issue, defense counsel did not object, but our position is there is plain error in the record. Plain error. The court, sua sponte, the district court sua sponte during the sentencing hearing, no one-the defense counsel did acknowledge that the 2015 guidelines should be used as to loss in her sentencing memo. But at the actual sentencing hearing, the court sua sponte recognized we need to use the 2015 guidelines with regards to loss. And the district court actually later on said or acknowledged the need to use the 2015 guidelines. Then, for whatever reasons- We all know that. Tell me how it matters here. What I'm thinking is you take a bit of a gamble here. Let's assume that we rule that it is plain error. You should have used- Yes. The problem for your client arguably is as to sophisticated means, it may be harmless because the new requirement for sophisticated means is the defendant has to intentionally engage in or cause the conduct constituting that. I don't think that's going to be a real tough showing for your client. Ms. Snow may have an argument on that. The more than 50 victims, though, is particularly dicey. That's no longer in the guidelines. However, it's a lower number of people with a higher standard. So if you went back on remand and the government could show that there were 25 victims, much less than 50, and there were 25 here for sure- Yes, Your Honor. That there were 25 and that those victims suffered a substantial hardship, which is defined in the guidelines, then your client would not be looking at four levels. He'd be going up to six. So my question was, did defense counsel know that and kept her mouth shut and was happy with a four, or are you at some jeopardy if we remand on that issue? I think that what we have for plain error is an error existed. It's obvious. It's plain on the record. And what we know based on how he was sentenced, there was prejudice because we know he received an enhancement for 50 victims when that enhancement was abolished. You're saying you're willing to roll the dice and go back on remand and maybe get two more levels? There is no record evidence that there was a- Get that. You're willing to roll the dice, go back, be resentenced, and the government, if they can come up for just 25 victims, substantial hardship, your client will be looking at an increase in his guidelines at that point. You're willing to take that risk? Respectfully, my client is asking the court that, as with every other criminal defendant, he be sentenced under one guideline. In this case, it's the 2015. We are aware that there are possibilities, but all of that is contention. No North Carolina v. Pierce argument. He could go back and get a higher sentence. I just want to make sure that's what you're asking. Yes, Your Honor. All right. Thank you for your time. All right. Thank you very much. May it please the Court. Linda McNamara for the United States. And I'd like to start with loss to dispel this notion that the district court's findings were based on a mere proffer by the United States. At the beginning of the sentencing hearing, the district court judge explained to the parties that the court takes copious notes throughout the trial. The judge said that he had 94 pages of notes that he'd taken throughout the trial. He had reread those notes before the sentencing hearing. And he demonstrated his familiarity with what had happened at the trial by specifically referring to the testimony of several witnesses as to what they had testified to with respect to loss. He specifically referred to the testimony of Jack Mloger and Jerry Castileo, who were witnesses from Hewlett-Packard, regarding their review of invoices that had not been submitted to Hewlett-Packard at all that had been sold to Merrifactors and to Prestige to the tune of $2.8 million that had never been submitted to the OB-10 system at Hewlett-Packard. The court also clearly relied on the other trial testimony. We had testimony. A question. This is a very impressive and thorough judge. He had lots of notes, and, boy, he went through it. My question is numbers. Yes. And so what is your evidence to get you to $3.5 million? So you say Prestige is $2.8 million. That's clear that those were never submitted. Just simplify it for us, if you could. So we had trial testimony from Kevin Gowen, who was the Merrifactors president, and his testimony at trial was that at the end of the day, Merrifactors had lost $2,757,965. Do you have to discount that by the 90 percent? Correct. And so that's what their objective is. But that ends up not being 2.7. It ends up being, what, 2.4? 2.5. Yes, 2.5. So you're up to 2.4. Where do you get your other $1.1 million? We get the rest from the Prestige losses. The testimony at trial from Agent Culbertson was that the Prestige investors had paid $8.5 million into Prestige. They had received back $3.5 million. So that left a difference of $5 million. Now, of that, a net of But that's not necessarily due to any illegal activity. There could have been a multitude of factors for them not getting their investments back. Well, the testimony was that $2.9 million of that had been paid to Newton's company, B&B, after which B&B had transferred directly to Newton another $3.1 million. Now, that's not what the Prestige investors paid their money for. They invested to buy DataForce Hewlett-Packard-backed invoices, not to transfer the money to Newton. So how much went to Newton? $2.9 million? $2.9 million went to B&B, and then B&B transferred $3.1 to Newton because B&B was also getting money from other sources. So those investors You're saying there's no way that $2.9 million could have earned anything for them because it was immediately taken from the company. That's not what they were investing for. That was not the purpose of their investments. They believed that they were buying Hewlett-Packard-backed invoices from DataForce, and that's what they were getting. They weren't paying Newton the money. So that was an additional That easily gets us over $3.5 million. And at sentencing, we presented an updated chart prepared by Agent Culbertson, the witness who had testified during the trial, where he listed out the names of the witnesses, the victims, the number of the prestige victims, and how much each victim had lost from their investments. And that came to a total of $4.7 million that those investors had lost from their investment in prestige. So we had $2.5 from AmeriFactors. We had $4.7 to the prestige investors, easily more than the $3.5 necessary for that 18-level increase. And the same amounts they were ordered to pay in restitution as well. But all those numbers, just to make it clear, I hope, or clearer, I hope, all of those numbers are not tagged on to each other. There's overlap, right? Because if not, you'd be way over. We're way over. We are way over. No, because, I mean, you don't add the $2.5 million plus the $1.1 plus the $3.1 plus the $4.7. Right. We have $2.5 for AmeriFactors and $4.7 for prestige. That's what we contended the losses were. Right, but all the other numbers that you've talked about are all included as portions of those other two universes. That's right. That's how we get to those numbers. You're saying if $4.7 is too high for whatever reason, at the least it's $2.9 million that went to B&B. Easily, yeah. We easily get to $3.5. Even if you discount this $4.7 for some money that was supposed to go to this other company, Etisol, we easily, easily get to $3.5 based on the trial testimony that was refined by the charts that we submitted at the sentencing hearing prepared by Agent Culbertson in response to their objections that we hadn't taken into account this 90% and that we hadn't taken into account invoices that had been bought back. Once we addressed those concerns, they didn't say, no, no, no, you've got to put Agent Culbertson or some other witness on the stand. You need to present further evidence of this. Agent Culbertson was there at the sentencing hearing and could have testified, but that was not what they asked to do. They asked us to address those deficiencies they thought with our original loss calculation. Once we've done that, they didn't object further. The district court found our charts to be credible and easily met that $3.5 million threshold. I also, if there's no further questions on that, I wanted to address the one book rule error because I think it's an error that Newton invited the court to make and possibly did so purposely because it inured to his benefit. At the beginning of the hearing, there was discussion about the 2015 book and the change to the loss guidelines and those ranges. Now, Newton, however, didn't argue that there were any other changes in the 2015 book that applied to him. In fact, throughout the hearing, all the discussion was about this 50 victims and whether we'd proven 50 victims. His sentencing memo was about that, and that's what he argued during the sentencing hearing. And the 50 victims had no—that had nothing to do with the—under the 2015 guidelines. Fifty doesn't come into play at all. You have— So it's a possibility that that was done purposely for the reasons I suggested to counsel, that you'd get more, but there's also a chance the attorney hadn't focused on it and just didn't even know about the amended guidelines. It's certainly possible, but I believe that this was an invited error because all he was talking about was this 50 victims, 50 victims, 50 victims. No, he never brought to the district court's attention that there was any other thing that the court needed to look at, whether it was substantial financial hardship to 1, 5, 10, or 25 victims. Never brought that to the court's attention. So, you know, we talk about whether the defendant directed the court down the primrose path to error. This is clearly the primrose path to using two books. But even if we don't get there and we look at it under a plain error standard, he has to show harm to his substantial rights, which in the plain error— within the sentencing context means that he has to show a reasonable probability he would have received a lesser sentence, and that he can't show. Now, the district— Why is that? Let me run you through the numbers. Okay, the district court here found that he had a level 36. That's the level that he was sentenced under. Under the 2014 manual, if we looked only under the 2014 manual, we start with a base offense level of 7. With a loss of more than $7 million, we add 20 levels. And the PSR said there was a loss of more than $7 million. Our numbers I just gave you gives us a loss of more than $7 million. We easily could have proven a loss of more than $7 million. So we're up to 27. So you're saying with the old manual, he's already buying himself two more levels than he got with the new manual. Correct. And then we have more than 50 victims. He gets another four for that. We proved 66 victims. Sophisticated means gets him two. Manager or supervisor gets him three. And obstruction gets him two. So we're up to 38 under the 2014 manual. He undoubtedly would have had a higher offense level under 2014. Under 2015, he would have had higher or the same. Going through that, he has a base level of 7. Again, we get to the loss of more than $3.5 million, gets him another 18. So we're up to 25. Now we get to this number of victims, substantial financial hardship issue. If we proved five or more victims had a substantial financial hardship, we add four. And we had 15 victims who lost more than $100,000. We had 34 who lost more than $25,000. Well, substantial hardship is a pretty tough test, though. The question is, did you have five victims or more than that? The victim became insolvent, filed for bankruptcy, lost retirement, had to change employment, substantial changes to living arrangement, couldn't get credit. Did you have five victims that would meet that definition? We don't have evidence of that in the record because this was not an issue. So we don't know. We don't know. All we know is how much each of those victims lost. And we have – So, I mean, I guess you would turn it and say the defendant, to prove his substantial rights were affected, would need to tell us that there weren't those, but nobody. There's nothing in the record. That's right. That's exactly right. I mean, we had six victims who lost more than $200,000. So, I mean, I think we could have proven that, but the record doesn't show that. So, anyway, so all we needed was five or more to get him the four. He gets six more if it's 25 victims who had substantial financial hardship. Then we have – the sophisticated means is two, manager and supervisors, two – I mean, three. Obstruction is two. So he either gets 36 or 38 under the 2015 book, depending on how many victims had a substantial financial hardship. So he either comes out the same or worse under the 2015 book. So he can't show a reasonable probability that he would have received a lesser sentence had this error not occurred. It's error, yeah. It's error to not use one book. But he can't meet the plain error standard. How about Ms. Snow? Her attorney didn't argue it, but she had a shot on sophisticated means. She had a shot at lowering her guidelines by two levels, did she not, with a new definition? Well, first of all – So you're saying she goes back through these same calculations again. Right. This is not an issue she's raised. She didn't challenge sophisticated means in the district court. And, in fact, her sentencing hearing occurred immediately after Newton's sentencing hearing, and her counsel came in and said, I had a chance to sit through Mr. Newton's sentencing, and so I heard the arguments put forth by the defense and the government and your honor's findings, and I don't feel it's necessary to try to re-litigate your findings, Judge. I believe you took your time and made well-thought-out rulings. So, again, invited error. If there's an error with respect to sophisticated means as to her, she invited that error. And it's not an issue that's been raised in the briefs. It's an issue she's never raised, so I just don't think it's an issue here at all. She also got a substantial departure that would actually knock out a lot of these, although I don't believe the judge indicated he would have given the same sentence. He didn't use the magic words to say, That's right. Right. But if we're looking under a plain error standard, she had this huge variance downward. She can't show a reasonable likelihood she would have gotten a lesser sentence. So even if the court were to look at that, she can't meet that burden. Could you go over this intent issue? Yes. Yes. Now, of course, again, this is an invited error. I don't think that the court should look at this at all. The jointly proposed instructions say these instructions are being jointly recommended by the parties in this case. During the charge conference, when asked about these instructions, both defendants said they had no objection. They didn't object at the close of the jury charge. And there was no motion for judgment of acquittal based on a lack of willfulness. And the one that was submitted was the stock instruction out of the Eleventh Circuit. Correct. Yes. Do you know the history and background of when that was created and why the intent issue was not put in there? Well, in 2010, the pattern jury instructions were amended to remove willfulness from the instructions as to any crime that that was not, willfulness is not specified in the statute. In the statute. That's exactly right. And willfulness is not specified in the mail and wire fraud statutes. Now, I do think there is a question as to whether willfulness subsumes intent to defraud, intent to defraud subsumes willfulness. There is a case that out of this circuit and dicta kind of suggests that they are one in the same. It's not cited in the brief, but it's Ray versus Spirit Airlines, 767 F3rd 1220. There in dicta, that was a civil RICO case. The court said that mail and wire fraud are specific intent crimes requiring that a defendant acted with bad purpose, either to disobey or disregard the law. It then cites Maxwell for that proposition. Well, doesn't the purposefully word specifically, isn't that included in knowingly and willfully? I think you're right about that. Maxwell says the specific intent required under the mail and wire fraud statutes is the intent to defraud, not the intent to violate a particular statute or regulation. So I think when this court says that in Ray versus Spirit Airlines, when the court said that the defendant has to act with bad purpose or to disregard the law, and cites Maxwell, it's for that proposition. Not a mistake or accident. Correct. Yes, that's right. The problem is, I mean, putting aside for a moment the invited error contention, that there are a number of cases from the circuit, whether rightly or wrongfully decided, that indicate that willfulness is a separate and distinct element beyond knowingly. That's true, yes. But there are no cases from this circuit saying that willfulness, apart from intent to defraud, is an element of mail and wire fraud. You won't find that in this circuit. There aren't any. That's just not the case. The cases with respect to the intent required for mail and wire fraud is a specific intent to defraud. Well, but going back to Judge Schlesinger's question a little while ago, it seems to me that looking at the drafting history of the Eleventh Circuit pattern jury instructions, which aren't binding, Right. I think some rule committees must have believed that those statements in prior Eleventh Circuit opinions grafted on a willfulness element, correctly or incorrectly, and that's why willfulness became part of the standard pattern jury instruction. Then once the Supreme Court started sort of reversing course on that, another committee of rule makers decided to take it out of the Eleventh Circuit pattern jury instruction. So it's pretty unclear what our prior cases meant about willfulness, whether it's a distinct element, whether it's subsumed with an intent to defraud. Well, even prior to 2010, you won't find cases in this circuit saying that willfulness is an element of mail and wire fraud. I can't tell you what the rule is. But there are cases that say you have to prove that it was knowing and willful. That's a pretty strong way of saying that. And mail and wire fraud context, I have not seen that. There are cases that cite that 2010, the pre-2010 jury instruction that say that, you know, the jury instructions instructed that they had to be knowing and willful or whatever. But I didn't find any case holding, even prior to that amendment to the jury instructions, that willfulness was an element of mail and wire fraud. I didn't find that, and believe me, I looked. So, and in any event, even if we don't have invited error, they'd have to show plain error. And as we're discussing, they can't show that it's plain under 11th Circuit law that willfulness is an element of mail and wire fraud. They can't show that. There's not an 11th Circuit binding precedent that would hold that. So they can't meet the plain error standard either. The only other thing I wanted to mention was your question about the tax return on this failure to redact. That tax return was from 2003. So that was going to be one of the points that I was going to make, that nobody can show any type of harmfulness here, because even if they could show that the jury saw this signature line on the back page of a tax return that had a name on it that didn't specify that she was actually, this woman was actually married to Mr. Newton, they couldn't show harm because, you know, a jury easily could have found this was 2003, they're divorced by now, he's in a relationship with her. Was the notion behind the request for the ruling that the jury would think even more harshly of Ms. Snow and Mr. Newton if he were married? The jury knew that they were having an affair. Right. And so it's just that they might, a little more, in addition to everything else, they might think badly of those two. They'd think that they were also adulterers. Right. I mean, there was a motion in Limoney to exclude this testimony, and I think the court just felt that it wasn't necessary, it wasn't particularly relevant, and there was no reason to bring that up. Thank you very much. All right. Thank you. Mr. Abrams. Thank you. It is clear from the trial transcripts that Ms. Snow was Mr. Newton's assistant, operated under his direction, was his employee, and did not gain financially. I think the words that they used by the special agent was pretty much evened out in her bank account. She did let Mr. Newton use her bank accounts and her credit cards for this scheme, but she did not gain financially, at least substantially. As to willfulness, this court has shown, it has talked about how since time, since nearly as long as mail fraud and wire fraud have been laws in the circuit, that willfulness was a requirement. If you look at all the other circuits in this country, nearly every one of them required and set the elements, including knowing and willfully. The two exceptions that I can find was the Fourth Circuit, where they talk about purposeful of executing a scheme, and a recent unpublished decision from the Ninth Circuit, where they removed willfulness because it did not appear in the statute. But as we know, the statutory interpretation or the statute language is just one aspect of the law. You have to look at the case law as well. If you intend to defraud somebody, haven't you acted willfully necessarily? I don't remember all the words willfully, do that, purposefully to do that, something wrong. Intent to defraud has the specific meaning of intent to deceive or cheat. But again, from the jury's perspective, they don't look at that. Tell me what the definition of willfulness is in the pattern instruction. Read it out. Willfulness is voluntary and purposely acting with intent to do something the law forbids, with bad purpose to disobey or disregard the law. In other words, an evil mind. If you intend to defraud, haven't you met that requirement? Again, we're looking at it from the jury's perspective and saying that the jury will look at a deceit or cheat in a different light. They're not going to look at it in terms of potentially a criminal act. Would anybody ever think what they did, intending to defraud people, was lawful? I'm sorry, one more time. Would any juror ever think that what they did would not also meet the standard for willfulness? They would look at it, but also from Ms. Snow's perspective, she was acting under the direction of Mr. Newton. She was doing what Mr. Newton asked. She was his employee. She intended to defraud people. That's what the jury found. But she, again, the defrauding is usually for financial gain. She did not gain financially. The argument that the government made was that, oh, she participated in this $1,200 or so dinner attended to by all the other employees, and there was a company apartment that she used occasionally on it. But there's nothing to show that she gained financially out of the millions of dollars. There's nothing to show that she got anything. All right, Mr. Draper, thank you very much. General Lear. Without belaboring the point, just very briefly on the issue of loss, the notion that somehow the loss was proven because of the flow of money to Newton suggests that we're now looking at a gain to Newton. The record evidence doesn't support that. Their own agent testified Newton loaned hundreds of thousands of dollars to these companies. There were credit cards that contained expenses that were legitimate expenses, and none of that was calculated by the agent. He didn't look at any of that. So they cannot prove loss by gain. The defense counsel at the sentencing hearing, she told— What I think they're saying is that obviously if that amount of money is taken out of the company, that amount of money is not being used for the purpose the investors invested their money. What is wrong with that argument? Well, if you're going to look at monies taken out from any particular company, you still have to look at the big picture, the buybacks, the amount of factoring, all of that. And then if you're looking at prestige, because I think now that's what they're talking about, with prestige, only three witnesses testified at the trial. To sum it all up, we know what the loss is merely because the prosecutor at the sentencing hearing told the court, and that's insufficient. His words in a piece of paper are insufficient, particularly when defense counsel advised everyone, prove it up. That's another word— Once again, counsel didn't argue absence of authentication, or we don't know your numbers are right. She argued about the concept of how the methodology— I would respectfully submit that using the terms prove it up, she used the term. They have the onus to prove it is one and the same. Did she ever at any time say, Judge, we don't know where these numbers came from? It's a piece of paper. I didn't read that in the transcript. She didn't say those words, but she did repeatedly say she disagreed with the numbers. And at the end of the day, all it takes under the law is a factual dispute, a factual dispute with numbers in the PSR facts, and then the burden shifts to the government to prove it. So I respectfully rely on my brief that I filed with regards to that. The only other issue, and I'm running out of time, is sophisticated means regardless of what guideline you use. I don't believe that that was proven. Thank you. I'm out of time unless the court— You can finish up. Ten seconds. So sophisticated means the vast majority of the cases, if not all, require fictitious entities, things of that nature. In this case, Mr. Newton took one invoice, sold it to two different people, and he used his real name, real bank accounts, real business entities. Inevitably, he was going to be discovered. The paper trail that was shown in this case was largely a result of Mr. Newton's simplistic acts in this case where he used his own bank account and moved money to another bank account, had his own name in it, selling one item to two different people. There is no other net result than ultimately being caught with the conspiracy and the charges that were levied here. And so I respectfully submit, regardless of what guidelines you use, sophisticated means enhancement should not have been applied. Thank you very much. Thank you very much. Mr. Abrams, we know that you were court appointed, and we want to thank you on behalf of the court for your service to your client. We do appreciate it. Thank you. Thank you. Thank you.